Statement of the Case.
MONROE, O. J.
Plaintiff brought this suit and caused a seizure to be made by attachment upon a claim of $4,044.75, being the unpaid balance (amounting to $3,954) of the purchase price of a traveling electric lumber crane, and the unpaid price (amounting to $94.75) of certain other articles, which crane is alleged to have been manufactured for, and sold and delivered to, defendants (described as a commercial firm, domiciled in Chicago and composed of D. K. and Fred. J. Jeffris), as per verbal contract of date February 6, 1912, subsequently confirmed, and which articles are likewise alleged to have been sold and delivered to defendants. Plaintiff also asserted a claim for damages for certain extra expens.es, alleged to have been incurred through the fault of the defendants, but during the trial accepted a judgment of nonsuit with respect thereto. The Concordia Land & Timber Company intervened, alleging that the contract sued on had been entered into by defendants as its purchasing agents for its account, praying that the crane be released to it on bond, that it be decreed the owner thereof, and that its right of action against plaintiff for damages be reserved. Plaintiff (having its domicile in Ohio) excepted to the intervention for want of citation, and, the exception having been sustained, a curator ad hoe was appointed to represent it, and he thereupon filed an answer -in its behalf and a plea of estoppel, alleging that the crane had been sold to defendants for themselves and not for intervener, that intervener was well aware of the negotiations leading to, and culminating in, the sale, and, having remained silent with respect to its alleged interest, could not novt be heard to assert the same to plaintiff’s prejudice. Defendants then moved to dissolve the attachment, on the grounds that the allegation upon which it was obtained (i. e., the nonresidence of the defendants) was untrue, and *171 that the counsel, by whom the attachment was obtained were unauthorized to that effect, which motion was overruled. Defendants then filed an exception, which was sustained to the extent of requiring an amendment to the petition, and thereafter filed an answer, denying, admitting, and alleging in substance as follows: They deny that they are a commercial firm domiciled in Chicago, and allege that they are an ordinary partnership, with their principal place of business in Concordia parish; deny any indebtedness to plaintiff; deny that they purchased the crane for themselves, and allege that, to the knowledge of plaintiff, they acted in the matter as the purchasing agents of, and bought the crane for, intervener; deny plaintiff’s allegation that they paid $5,000 on account of the price of the crane, or any other amount, but admit that $5,000 was so paid by intervener; admit that the crane ordered for intervener — being that described in plaintiff’s petition — was delivered and erected about December 15th, instead of June 1, 1912, as stipulated in the contract, but allege that the erection was accomplished in an unsatisfactory, inefficient, and unworkmanlike manner, and that there was unnecessary delay therein, as also in the manufacture and shipment of the crane, by reason whereof and of the alleged illegal attachment the intervener sustained loss and damage in an amount exceeding $40,000; that, upon February 2S, 1912, they entered into a contract with intervener to have the crane in question furnished “in all respects as has been, or may hereafter be, agreed upon by said Crane Company,” and undertook to protect intervener in all respects and assume all obligations on the part of said Crane Company with respect to the said crane; that, feeling themselves legally and equitably responsible to intervener, by virtue of said contract, for the damage that it has thus sustained, and demand being made upon them by intervener, they have compromised and adjusted the same by paying intervener $8,-500, in consideration whereof it has sold and assigned to them its claim for damages against plaintiff, and subrogated them to its rights with respect thereto. Wherefore, assuming the character of plaintiff - in reconvention, defendants pray for judgment against plaintiff in the sum of $43,728.43, as the damages sustained by intervener. Towards the close of the trial, defendants took a nonsuit with respect to the larger part of said amount and are here claiming only $2,399.04, representing alleged loss and expense incurred by intervener, on account of the attachment of the crane.
There was judgment in the district court in favor of plaintiff for the amount claimed by it and sustaining the attachment. Defendants and intervener have appealed, and plaintiff has answered, praying that the judgment be affirmed.
Opinion.
As against defendants’ sworn denial that they are commercial partners and allegation that they are ordinary partners, with their principal place of business in Concordia parish, we find in the record the following uncontradicted testimony, upon examination in chief, of F. J. Jeffris, one of the members of the firm, to wit:
“Q. What is the class of business that D. K. Jeffris & Co. do? A. Dealers in lumber — buyers and sellers of lumber. Q. Do you do a small or extensive business? A. Sometimes we have done considerable; we have done a good deal of business. Q. Whereabouts, and state the volume? A. In Chicago is our main office— or head, or only, office; we buy lumber all over the country. * * * Q. Where else do you do business? A. All the business is done in Chicago.”
As against their denial that they paid plaintiff $5,000 or any other amount on account of the price of the crane, we quote their letter of September 17, 1912, written after the crane had been delivered to them and prior to its erection, to wit:
*173 “Inclosed herewith please find' check for $5,-000, which kindly credit to our account, and oblige.
“Yours very truly, D. K. Jeffris & Co.,
“[Signed] W. O. S.”
The letter was written on paper bearing the heading (with some other matter):
“David K. Jeffris Fred J. Jeffris
“Chicago Chicago
“Clarence Boyle, General Sales Mgr.
“Chicago.
“D. K. Jeffris & Co.
“Manufacturers and Wholesale Dealers “Hardwoods, Cypress,
“Yellow Bine and Pacific Coast Woods.
“501 Pullman Building, Chicago.”
It is not disputed that the $5,000, so forwarded, was intended and applied as part payment on the price of the crane.
As against their denial that they dealt with plaintiff for their own account in the matter of the purchase of the crane in question, and their allegation that, to plaintiff’s knowledge, they acted as the purchasing agents and bought the crane for intervener, we find the evidence entirely conclusive to the effect that, in December, 1911, plaintiff’s agents in Chicago, learning that defendants were in the market for the purchase of a crane, called on them and obtained information, together with a rough sketch of some kind (on the back of an envelope), which were forwarded to plaintiff’s main office in Toledo, Ohio, and led to a call, during the same month, upon defendants by plaintiff’s engineer in charge of crane construction, followed by correspondence, in January and February, 1912, and the preparation of drawings and specifications, of a somewhat general character, as we infer, which, prior to February 6th, were submitted to and discussed with F. J. Jeffris, representing his firm. On February 3d defendants wrote a letter to plaintiff, addressed on the inside to Mr. Tucker, its engineer, requesting him to call on the following Monday or Tuesday, and “bring complete drawings and specifications,” and saying:
“We are now ready to close this matter up, and your prices will be in line, provided the weight of your crane and the specifications and design are satisfactory.”
Mr. Tucker accordingly called at defendant’s office on Tuesday, February 6th, and testifies that he took with him and delivered to Mr. F. J. Jeffris, who represented defendants in the matter, a form of contract and certain specifications which had been made out in triplicate, one of which is attached to the amended petition.
There was an interview in the morning, and another at 2 o’clock, from which latter the gentlemen went to the office of Mr. Keller (an engineer whose advice Mr. Jeffris desired to obtain), where they spent three hours in discussion; they then returned to the office of D. K. Jeffris & Co., had further discussion, and an agreement was reached (the particulars of which will be referred to hereafter), which resulted in Mr. Tucker’s being instructed to “go ahead with the crane.” On the following day a letter was written by defendants to plaintiff, which reads:
“We wish to confirm the order we gave your M. O. H. Tucker last night for Gantry crane at $8,950, delivered to our sawmill plant, being constructed one mile north of Morville, Da. This price covers complete crane, erected and run by you in our plant, you to leave competent engineer with us a week after the crane is constructed and running to teach our employés to handle same; the crane to be built and designed in a manner satisfactory to our engineers, and to be fully guaranteed in every way to do our work, which we have already outlined to you in detail.
“You may go to work at once on this crane, as you understand that we will desire it delivered and erected complete by June 1st.
“This letter is merely a preliminary order authorizing you to go to word on same, but with the understanding that all details of construction, design and material shall be fully and completely satisfactory to our engineers, and that you guarantee the crane to do the work required of it” (Italics by court.)
“You may forward us complete details, specifications, and contract, fully covering what you propose to furnish, as early as possible, so that the same may be looked over, discussed, and when approved it will constitute a contract between us. The object of this letter, as I said *175 to Mi1. Tucker, is merely to confirm the fact that we want the crane built, and relying upon his assurance that he can give us a crane satisfactory in every way and strong enoiigh to do the work and designed particularly for the excessive travel which we expect to put it to. We will ask you to give this your prompt and best attention, as we desire to have the matter pushed with all possible speed.”
The third, and fourth paragraphs of the letter thus quoted, otherwise somewhat difficult to construe with the first and second paragraphs, are explained by the following testimony of Mr. Tucker, and by the subsequent correspondence between, and acts of, the contracting parties, to wit:
Testimony of Mr. Tucker:
“Q. Did you make a contract, on February 6th, with D. K. Jeffris & Co. for the delivery of the crane in question? A. I did. Q. The crane sued on? A. I did. Q. What was the agreement at that time with regard to< any changes that might be made? A. As the drawings were made certain changes would be decided upon, and, from time to time, there were suggestions made, through the mail, regarding items referring to the general construction of the crane. The matter of speed was brought up several times. The speed, the hoist, the height of the crane were changed two or three times, and then the drawings were completed, and we finally arrived at a definite understanding as to how we should build the crane. * * * Q. Was it understood with Mr. Jeffris, at that time, that it would have to have such changes made as might bo necessary? A. He understood that thoroughly. Q. Were you to submit to him freely, from time to time, suggestions as to such changes as might be evidenced by the building of the crane? A. We were. Q. Was he to submit to you suggestions? A. He was, so long as it did not materially change the weights of the machine and the device. Q. And were suggestions, from time to time, made by Mi-. Jeffris in regard to this machine, as it developed? A. There were.”
On cross-examination:
“Q. Was the right to make these changes a part of the contract? [This question refers to certain partly written and partly printed forms of contract which had been prepared for signatures.] A. That was the understanding. Q. Is it embodied in the contract? A. It is not. Q. Does not that document contain all of the contract between you all? A. It does, in general.”
Following the letter of February 7th, and up to February 21st, inclusive, defendant wrote other letters to plaintiff concerning the crane, in all of which they treated the matter of its construction as one which had been agreed on and in which they alone were concerned. On February 28th they wrote, saying that they had received an inquiry from their Vidalia office for a rough sketch of the crane, that it was more than likely that other such inquiries would come from the same source, and that such correspondence might be carried on directly with plaintiff, after which we find the following:
“In order to save time, we will ask that the information requested in the beginning of this letter be forwarded to our southern office, and inasmuch as this crane is for the Concordia Land & Timber Company you had better address the mail to them and enter it on your records as for the Concordia Land & Timber-Company. You can, however,' draw the contract with us if you wish, although it is for the Concordia Land & Timber Company, and will be paid for by them, and is really bought for them.”
The evidence shows, without attempt at contradiction, that plaintiff had never before heard of the Concordia Land & Timber Company; that they entirely ignored the suggestion that that company be substituted for defendants as the party with whom it had contracted; that in a correspondence, of which 79 letters from defendants to plaintiff and 74 letters from plaintiff to defendants (all concerning the crane) have been copied in the transcript, the name of the timber company is nowhere again mentioned or alluded to, and that, as we have stated, on September 17, 1.912, defendants (not as purchasing agents, but for themselves) wrote to plaintiff inclosing a cheek (drawn by the company, whether to plaintiff’s order or defendant’s does not appear) in part payment of the price of the crane and requesting that the proceeds be placed to the credit of “our [their] account,” which was done, as plaintiff had no other account to which the price of the crane was debited. The evidence also shows that the Concordia Land & Timber Company is composed of D. K. Jeffris, president, who holds 15/48 of the stock, M. *177 O. Mouat, vice president, who holds 6/48; F. J. Jeffris, treasurer, who holds 5/48, M. G. Jeffris, secretary, who holds 12/48, and Mervin Hughitt, Jr., who holds 10/48, and that the three Jeffrises are brothers and Mouat is their cousin; the family connection of Hughitt not having been inquired into.
It appears also that in support of their allegation as to their moral and legal obligation towards the intervener and their settlement with it, defendants attached certain documents to their answer, and made them part of the same, and among them a communication purporting to be of even date (February 28th) with the letter last above quoted, and to contain a proposition from defendants to intervener, and “accepted by M. G. Jeffris, secretary,” which reads in part as follows, to wit:
“Chicago, Ill., Feb. 28, 1912.
“Concordia Land & Timber Co.: We have been negotiating with the Toledo Bridge & Crane Company * * * for * a crane to handle your lumber. * * * We have made a contract for such crane in your behalf. This contract is by correspondence, and will probably be followed by a more formal contract, but, in any' event, the contract is now complete. We have this day notified said Crane Company that the crane was for you, and they may, if they choose, make a formal contract with you, or at their option they may make.it run to us as heretofore. In consideration of your accepting this and agreeing to pay for said;crane and assume all liability on our part, we agree to furnish said crane fully as it is now, of may hereafter be, agreed on between us and said Crane Company.”
M. G. Jeffris, who dictated the proposition on behalf of defendant, and accepted it, on behalf of intervener, was unable to say, positively, whether it bears the correct date or not, and, though he attempted to refresh his memory.by referring to a letter written to D. K. Jeffris after the institution of this suit, we do not see very clearly how he could have become enlightened in that way.
D. K. Jeffris testifies that M. G. Jeffris suggested the proposition “to protect” them (D. K. Jeffris & Co.) “from the corporations” (referring to various milling corporations in which D. K. Jeffris & Co. have interests), and, further, as follows:
“Q. You acted as purchasing agents, you say, of the Concordia Land & Timber Company? A. Yes, sir. Q. You don’t act as purchasing agent any longer? A. No, sir. Q. Why not? A. Because they have got established, more or less; they didn’t have any credit rating and were unknown at this time. Q. At the time this letter was written, the Concordia Land & Timber Company had no credit rating, and were not known? A. No, sir. Q. And contracts were made by you in your individual name because the Concordia Land & Timber Company had no credit standing ? A. Yes, sir; that is a fact.”
Referring to the affidavit, affirming the verity of the allegations contained in defendants’ answer and demand in reconvention, the witness recognized his signature, but said that he did not know that he read tha affidavit at all; that the attorneys told him to sign it, and he did so; also that he took the oath as therein recited. He further testified that, though he recognized his signature to the letter and proposition submitted to, and accepted by intervener, he did not know when or where he signed it, or what it contained.
[3] From all of which we conclude that defendants dealt with plaintiff throughout in their own name and for their own account; that intervener did not acquire the crane from plaintiff, with whom it has had no contractual relations; and hence that the alleged basis upon which it rests the claim here set up has never existed, and that the claim has therefore been properly rejected.
[1] Considering the question of contract vel non, as between plaintiff and defendants, we are of opinion that defendants cannot be heard to assert, in argument, that there was no contract, since their position in the ease, concurring with that of the intervener, is predicated upon their sworn pleadings to the effect that the title to the crane passed from plaintiffs to intervener by virtue of a contract entered into between plaintiff, of the *179 one part, and intervener, acting through defendants as its purchasing agents, of the other.
The petition of intervention, sworn to by D. K. .Teffris as intervener’s president, contains the allegation and prayer:
“That petitioner acquired said traveling crane by purchase from the Toledo Bridge & Crane Company, under a contract made and entered into by and between said Toledo Bridge _ & Crane Company and D. K. Jeffris & Co., acting as purchasing agents for petitioner, which contract of purchase was made, verbally, at Chicago, Ill., February 6, 1912, and confirmed by letters of date February 7th and February 8, 1912. * * * Wherefore petitioner prays that, * * * after due and legal proceedings and delays, there be judgment in favor of your petitioner decreeing it to be the owner of said traveling crane,” etc.
The proposition of February 28th, said to have been submitted by defendants and accepted by intervener, is annexed to, and made part of, defendants’ answer, which is also sworn to by D. K. Jeffris, defendants’ president, and it contains the statement that the contract for the purchase of the crane, as made by correspondence, would probably be followed by a more formal contract, but “in any event, the contract is now complete."
[2] Beyond that, all of the, say, 150 letters, interchanged between plaintiff and defendants during the period of 9% months, following the letter of February 28th, presuppose or declare that work was begun, was progressing, or was complete, in the matter of the building and shipping by plaintiff of the crane which defendants had ordered at a fixed price, and which, time and again, they complained was not being completed within the delay contemplated by their “contract” with plaintiff. Time and again, also, in those letters, before and after they had made the first payment of $5,000 on tho contract price of the crane, and after the crane had been delivered, and was in operation, defendants offered excuses for not signing the form of contract which had been placed in their hands, and which, in fact, they have never signed; but the entire correspondence makes it clear that they never intended, and that plaintiff never intended, that the existence of the contract for the building of the crane should depend upon their signing such an instrument; and the only explanation that occurs to us of their failure to sign is that they feared that, by signing, they might cut themselves off from the privilege-of making changes in the details of the work as freely as they were accustomed to making them.
The bill of $94.75 represents the price of material delivered by plaintiff, in response to defendants’ telegram of October 5th, and required for the purposes of a change in the method of supplying the electric power to the crane — another method having been previously agreed on and provided for by plaintiff. After the material was sent, defendants’ president again changed his mind and concluded to adopt still another method, and the material sent by plaintiff was not used for the purpose for which it was sent, though whether it has or may be used for some other purpose does not appear, nor does it affect plaintiff’s right to recover the $94.75.
For the reasons thus assigned, we are of opinion that there is no error in the judgment appealed from, and it is therefore
Affirmed.